[Civil No. 3851.   Filed November 16, 1937.]

[73 Pac. (2d) 87.]

T. S. O'CONNELL, Arizona State Highway Engineer,
D. B. HUTCHINS, Superintendent, Motor Ve-
hicle Division of the Arizona State Highway
Department, Appellants, v. LEO FROST, S. C.
ROGERS, A. O. ROGERS and LEROY ROGERS,
a Copartnership, Doing and Transacting Business
Under the Style and Firm Name of LEO FROST
and ROGERS BROS., in the County of Navajo,
State of Arizona, Appellees.

Mr. Joe Conway, Attorney General, and Mr. A. R.
Lynch, his Assistant, for Appellants.

Mr. H. S. McCluskey, for Appellees.

ROSS, J.—This is a *mandamus* proceeding by Leo Frost, S. C. Rogers, A. O. Rogers, and Leroy Rogers, a copartnership, to compel the superintendent of the Motor Vehicle Division of the State Highway Department and the state engineer to audit, allow, and pay a refund of 5 cents on each gallon of motor vehicle fuel used by them "other than in motor vehicles upon highways of this state," as provided in article 6 (entitled "Motor vehicle fuel tax") of chapter 31, Revised Code of 1928 (sections 1673–1679), as amended by chapter 16, Laws of 1931–1932, First Special Session, and chapters 11 and 27, Laws of 1933.

■ The state engineer should not have been made a party as he has nothing to do with claims for refund.

■ While at the trial the Attorney General contended that the fuel upon which the plaintiffs asked a refund was used in operating motor vehicles upon the public highways of the state, the evidence quite conclusively shows, and the Attorney General now admits, that such gasoline was used by the plaintiffs off the public highways and on private ways and premises. The question now is, then, who paid the state tax, the plaintiffs or their truck owners, the law being that the one who pays the tax, if the fuel is exempt because of the use to which it is put, shall be by the state repaid upon a proper and timely application to the superintendent of the Motor Vehicle Division. The facts, although their interpretation is, do not appear to be in dispute and may be stated as follows: Between September, 1935, and April, 1936, the plaintiffs were engaged in constructing a dam for the Showlow-Silver Creek Water Conservation and Power District, in Navajo county. They bought fuel from the Standard Oil Company of California, distributor,

and paid therefor 19½ cents per gallon, of which 5 cents was the state's excise tax and 14½ cents the distributor's price, the latter being under the law constituted the state's agent to collect the tax. The gasoline was delivered by the Standard Oil Company to plaintiffs' tank at their construction camp and therefrom the plaintiffs supplied with fuel all motors and motor vehicles used in the construction work. The fuel was used in trucks, caterpillars, and for stationary power of all kinds, such as shovels and pumps.

The plaintiffs made claim on the superintendent of the Motor Vehicle Division for a refund of the state tax of 5 cents per gallon on fuel used by all stationary equipment and by caterpillars in such construction, and were repaid such tax.

They had from 15 to 20 trucks on the construction hauling dirt for them from the spillway or the barrow-pit and rock from a quarry. All this trucking was done off any public highway and on private ways. The plaintiffs made claim for a refund of the state tax on the fuel used by these trucks and the superintendent refused to make the refund, contending that the truck owners, and not the plaintiffs, paid the tax. The trucks were not owned by the plaintiffs but were rented or leased by them from the owners, 6 of them from Leo Frost and the Rogers, members of the partnership, and the rest from third parties or parties not interested in any way in the construction work. The trucks owned by the individual partners and leased to plaintiffs consumed 7,254 gallons of fuel and the trucks owned by parties other than the partnership consumed 6,339. It is the state tax on these 13,593 gallons that is in controversy.

The Attorney General does not contest plaintiffs' recovery of the state tax on the gallonage furnished the trucks of the individual partners but does

that consumed by the trucks owned by third parties. We think, however, plaintiffs (the partnership) should recover all or none. They were only the lessees of the trucks and the conditions of the leases were exactly the same. The plaintiffs as partners did not own any of the trucks. Leo Frost, who appears to be the active member of the partnership in charge of trucks, testified:

"The Court: All of these trucks you have here are under lease or contract, or whatever you call it, did you furnish them with fuel?

"The Witness: No, sir. I will explain that to you, Judge. We hired these trucks. We didn't hire the owner of these trucks at all. If he was a competent man, he could stay and drive his own truck 5 hours one shift on this job. If he was not, he was fired right along with the rest of the farmers that we tried to make truck drivers there, and we did fire a lot of owners on those trucks. These trucks were ours from the time they entered that job until they left, under contract agreement. We paid them so much each truck . . . $1.75 an hour. We charged them for drivers. We hired all the drivers put on those trucks. . . . We charged them with gasoline; we charged them with the board of those truckers; in fact, we charged them for complete maintenance of those trucks. . . . "

This witness repeatedly admitted that plaintiffs sold fuel to these truck owners and charged them for it 20½ cents per gallon. C. L. Crosby, the only one of the truck owners who testified, said he bought gasoline from plaintiffs and that the tax of 5 cents was included in the price per gallon.

Witness Frost claimed in his testimony that plaintiffs will lose 5 cents per gallon unless they are repaid the tax. He says the gasoline cost, according to the records, 25½ cents instead of 19½ cents per gallon, what the plaintiffs paid Standard Oil Company. This difference of 6 cents, Frost says, consists of 4 per

cent for evaporation and waste and "Maybe some of it was taken from the tank unbeknowst to us." He doesn't say when he discovered that the fuel cost plaintiffs 25½ cents per gallon but he does say, "The actual gas consumed cost me about 25½ cents on the job. That is what my record shows." Just how gasoline used on the job could have possibly cost 25½ cents when plaintiffs were paid a refund of 5 cents on that portion used in caterpillars and for stationary power is not explained. The "actual gas consumed" on the job according to plaintiffs' report to the superintendent, was 52,066 gallons. The use of gasoline was continuous from the beginning of the construction until the end, and it was hardly possible to know what the cost of the gasoline would be until the job was completed. The truck owners were charged for gasoline as it was delivered to them and monthly statements were made, balances struck, and truck owners paid whatever was coming to them, not on the basis of 25½ cents but on the basis of 20½ cents gasoline.

If the plaintiffs lost on gasoline, their experience is not uncommon to the commercial world. Tradesmen frequently find out that if they would make a profit they should have put a higher selling price on their goods. They cannot, however, price and deliver the goods to a purchaser and later, when it turns out the price was too low to allow a profit or prevent a loss, add to that price enough to make them whole or better. Sellers should fix their price, and indeed they usually do fix it, high enough to cover loss by shrinkage, waste, and obsolescence. If any of their goods is taken "unbeknownst" to them, that is their loss and not their patrons.

But plaintiffs claim the 20½ cents charged truck owners did not include the tax. Witness Frost testified:

"We didn't charge any trucker any tax at all. We hired these trucks at so much per hour and we sold them gasoline at a selling price that was our contract agreement."

In another place he said:

"Yes, the tax was included in the price when we purchased it and we charged the truck drivers no tax."

In other words, he says the tax was included in the price when the plaintiffs purchased it from the Standard Oil Company but it was not included in the price when plaintiff sold it to the truck owners. If we knock down the 20½ cents into its parts, we find this: 14½ cents to the Standard Oil Company, 5 cents to the state for taxes, and 1 cent for handling. Just why the plaintiffs should claim that the 20½ cents charged to truck owners had no relation to the 5 cents state tax, it is difficult to understand. If plaintiffs did not intend to include the tax in the price of 20½ cents but intended to preserve to themselves the right to claim a refund of the tax, they would have charged the truck owners the following items: 14½ cents to cover Standard Oil Company's price, 1 cent for handling, and 5 cents for shrinkage, waste, loss by pilfering, and for profits, making 20½ cents, but they showed by adding 1 cent for handling to the 19½ cents paid the Standard Oil Company that their price included the tax. The actual transaction is like what happens every time one has his automobile tank filled at a service station. The proprietor charges so much per gallon, the first and most prominent item of which is the state tax of 5 cents. He adds the price of the distributor and an item for handling, the latter being for his expenses and profit. The distributor has paid the tax to the state and has collected it from the service station and the latter, in turn, has collected it from the automobilist, who has paid for it and con-

sumed it. If the proprietor of the service station should happen to know that the automobilist consumed the gasoline in traveling over his farm, on roads built by himself for his own convenience, he could not collect the tax from the state, for, while he paid it to the distributor, he has collected it from the automobilist. This, it seems to us, must have been the situation here.

There is no restriction on the plaintiffs to charge enough to make a profit. They could have charged 25 cents or even 30 cents or whatever the buyer was willing to pay. But the fact is they charged 20½ cents and in that 20½ cents was included the state tax. They fixed their price to the truck owners on the basis of the cost per gallon to themselves and added the item of 1 cent for handling, intending that the price so charged should cover the tax. There is nothing in the record showing, or tending to show, that there was an understanding that if at the conclusion of the job the cost of the gasoline was shown to be more than 20½ cents per gallon the price to the truck owners should be proportionately increased.

Section 1677b, chapter 16, Laws of 1931–1932, First Special Session, *supra,* reads:

"§ 1677b. *Persons entitled to refund of fuel tax.* Any person buying and using motor vehicle fuel other than in motor vehicles upon highways in this state; or who buys such fuel and exports the same, and who shall have paid the license tax for such fuel, shall be repaid the amount of such tax, upon application to the superintendent, made in accordance with the provisions of this article."

It seems it is the person who in the final analysis bears the burden of the fuel tax who is entitled to be repaid the amount of such tax by the superintendent. We think it is quite plain that the truck owners have paid the tax to the plaintiffs and that it is they, and

494

not the plaintiffs, to whom the tax should be repaid. We do not think the fact that some of the trucks were owned by the members of the partnership in their individual capacity makes their situation any different from the truck owners who were not contractors. The partners paid the tax to plaintiffs as individual owners and not as partners and it is as individuals that they should be repaid.

We think the judgment should be reversed and the cause remanded, with directions that the plaintiffs' complaint be dismissed, and it is so ordered.

McALISTER, C. J., and LOCKWOOD, J., concur.